### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### TRENTON VICINAGE

| | |
|---|---|
| **NEWTON AC/DC FUND L.P.**, <br><br> *Plaintiff* <br><br> v. <br><br> **HECTOR DAO, FAROOQ HASSAN, and JOHN DOE**, <br><br> *Defendants*. | Civil Action No.: <br><br> **VERIFIED COMPLAINT** |

Plaintiff Newton AC/DC Fund L.P. (the "Fund"), by way of Verified Complaint against Defendants Hector DAO, Farooq Hassan (together with Hector DAO, the "Named Defendants"), and John Doe, allege as follows:

1. This dispute arises from the Named Defendants' waste and failure to protect investor funds. The Named Defendants sold their own proprietary cryptocurrency to investors like the Fund, who also traded that cryptocurrency on secondary markets. They promised that the investors could redeem the cryptocurrency for other assets. Not only did they fail to live up to that promise, but they squandered a large amount of investor funds and deliberately enabled the John Doe Defendant to steal even more. Investors like the Fund have suffered damages because they cannot redeem their investment for other assets and, even if they could, the Defendants have diminished those other assets.

### THE PARTIES

2. Plaintiff Newton AC/DC Fund L.P. is a Delaware limited partnership,

all partners of which reside in either Florida or Massachusetts.

3. Hector DAO is an unincorporated association that solicits business in the United States. The claims set forth in this Verified Complaint arise from Hector DAO's business activities in New Jersey, undertaken by one of its principals, Hassan.

4. Farooq Hassan is a resident of New Jersey. He maintains an address at 24 Elm Drive, East Windsor, New Jersey.

5. The John Doe Defendant is an unknown person who holds an account at the Binance Exchange.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this litigation arises from a violation of federal securities laws. It also has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(2) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

7. Venue in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Hassan resides here.

## FACTUAL ALLEGATIONS

**I.     HEC Tokens are Cryptocurrency**

8. HEC tokens are a cryptocurrency that is sent and received between

users electronically.  HEC tokens are not registered with the U.S. Securities and Exchange Commission.

9. Unlike traditional assets, HEC tokens are not controlled by any financial institution or government, and there are no physical tokens.  Rather, HEC tokens exist on a publicly available ledger known as a blockchain[1] that provides an immutable record of every HEC transaction to have ever taken place.  The records contained on the blockchain provide verification of the amount of HEC tokens each user is entitled to, as well as their transactions with other users.

10. HEC tokens are sent between users electronically by sharing public addresses (also called accounts or wallets) on the Fantom blockchain.  These addresses are represented by a string of hexadecimal characters (i.e. the numbers 0 through 9 and letters A through F),[2] and can be loosely thought of as akin to a bank account.  Unlike traditional bank accounts, however, all transactions to and from a given wallet can be viewed publicly on an immutable blockchain.

11. Just like cash can be kept in a purse, a home safe, or in a bank vault, cryptocurrency can be kept in different wallets. The contents of a wallet can only be controlled by a person who holds the private key to the wallet (a secure

---

[1] HEC tokens were originally and primarily issued on the Fantom blockchain, but mechanisms were created to trade them on the Binance blockchain and the Ethereum blockchains as well.
[2] One such public address or wallet, which this Verified Complaint discusses further below, is 0x86D3E3e133E32c1f2afe8069163a19Da01A5eF7c.

password that is cryptographically linked to the public address).

12. One feature of advanced blockchains like Fantom and Ethereum is that they support the use of smart contracts. A smart contract is a computer program that is stored and executed on a decentralized blockchain, and which allows users to create new forms of cryptocurrency tokens,[3] as well as to exchange cryptocurrency automatically once certain conditions are met. For example, a smart contract may allow one user to automatically sell one type of asset once another user offers to pay a predetermined price.

## II. Hector DAO Sold HEC Tokens

13. A decentralized autonomous organization (a "DAO") is an unincorporated association of people who collectively administer the operations of a cryptocurrency.

14. Hector DAO is a DAO that governs the administration of HEC tokens, a cryptocurrency it created and sold. One of its principals is Hassan.

15. Hector DAO maintains a treasury of assets (the "Treasury") that it holds for the benefit of holders of HEC tokens.

16. Hector DAO sold HEC tokens to investors.

17. Hector DAO promoted HEC tokens for sale because, among other

---

[3] The HEC token itself is essentially a smart contract which acts as a ledger for tracking which wallets own HEC tokens and in what amounts.

reasons, they derived value from the Treasury that Hector DAO could use to buy back or redeem HEC tokens. And it promoted the tokens for sale by expressly advertising the potential for buyers to pool their investments to build the cryptocurrency platform and to derive a profit from their investment in proportion to their financial contribution.

18. Hector DAO also promoted HEC tokens for sale because the tokens would permit holders to vote in election on issues concerning HEC tokens. Hector DAO agreed to abide by the outcome of these elections.

19. The Hector DAO sold HEC tokens in an unregistered offering without an applicable exemption or safe harbor.

20. The Fund purchased 18,642 HEC tokens, and the pro rata share of the Treasury those tokens represent exceeds $75,000. In buying these tokens, it formed an agreement with Hector DAO to obtain the right to vote in elections in exchange for Hector DAO agreeing to abide by the outcome of these elections.

### III. Hector DAO Offered a Redemption

21. Hector DAO expressly gave HEC tokenholders on July 15, 2023, the option to vote for redemption of their tokens for Treasury assets. Two days later, tokenholders overwhelmingly voted to redeem their tokens for treasury assets.

22. Redemptions for similar cryptocurrencies have taken days or weeks, but, over six months after approval of the redemption, Hector DAO has so far failed

to provide the promised redemption.

## IV. Hector DAO Has Squandered Treasury Funds

23. During this unexplained delay in the redemption, Hector DAO has not protected the Treasury assets that it agreed to use to redeem HEC tokens.

24. First, it announced on its website that it spent $1.2 million on "payment obligations arising from partnership agreements, software development, legal and operating expenses, and other contractual obligations."  These expenses are unusually high for a cryptocurrency the size of HEC, and upon information and belief, they exceed the value of any work performed.

25. Moreover, upon information and belief, Hector DAO paid its managers and employees millions of dollars in salary, far in excess of any value created by their work.

## V. Hector DAO Failed to Avoid the Theft of Treasury Funds

26. Hector DAO's mismanagement of the Treasury has resulted in a substantial loss of assets.

27. It paid an undisclosed amount of ransom to a hacker to resolve a 2022 security incident.

28. Then it lost approximately $652,000 in connection with a June 1, 2023, security incident.

29. Hector DAO lost approximately $8 million of Treasury funds because

6

of a hack and the subsequent dissolution of the Multichain cryptocurrency bridge platform, beginning on July 7, 2023. This loss was largely avoidable as numerous investors informed Hector DAO about how to preserve its assets from the attack, but the Named Defendants ignored these warnings and took no concrete action for several days.

30. Hector DAO also lost a material amount of Treasury funds arising from a cyberattack related to the Curve cryptocurrency protocol on or around July 30, 2023.

31. These incidents put Hector DAO on reasonable notice that it needed to maintain ample protection and vigilance against future cybersecurity incidents.

32. Despite this notice, Hector DAO made itself vulnerable to yet another incident. Even though other cryptocurrency platforms that perform redemptions only deposit assets incrementally into a smart contract to be used for the redemption, thereby minimizing exposure to any flaws in the smart contract (an ever-present concern in the cryptocurrency industry), as only the amount of assets under the control of the smart contract could be at risk at any one time. Hector DAO transferred all of the Treasury Assets all at once to a relatively new smart contract whose stated purpose was to execute the redemption (the "Redemption Contract").

33. Within hours of the funding of the Redemption Contract with the entire contents of the Treasury, an anomalous transfer of roughly $2.788 million worth of

Treasury Assets (roughly 22% of the total) was made from the Redemption Contract to an unknown wallet which had held only 0.0001 HEC tokens, or 30 billionths of 1% of the total supply, and thus was plainly ineligible to collect such a large quantity of Treasury Assets under the terms of the Redemption.

34. Hector DAO waited over two days to release a public comment about the anomalous transfer. A message posted on its official website confirmed that someone, John Doe, had stolen approximately $2.7 million worth of Treasury Assets from the Redemption Contract (the "Stolen Assets" and the "Redemption Cyberattack"). Doe was only able to steal so much because Hector DAO irresponsibly deposited substantially all of the Treasury Assets into the Redemption Contract, in one fell swoop.

35. John Doe is not a stranger to the Named Defendants. Instead, the Named Defendants deliberately participated in the Redemption Cyberattack. The Fund knows this because the wallet (the "Exploit Wallet"), whose address is 0x86D3E3e133E32c1f2afe8069163a19Da01A5eF7c, John Doe used to carry out the Redemption Cyberattack received funds from one of the Named Defendants' wallets, whose address is 0x55290de88b52470ef19e0f6798aa8010245789f4 (the "Hector Deployer Wallet").

36. The Named Defendants' control and use of the Hector Deployer Wallet is established by its role in paying the initial administrative costs for an important

"smart contract" on the Fantom blockchain. That contract's address is 0x51aeafac5e4494e9bb2b9e5176844206aac33aa3, and the Hector Deployer Wallet paid the costs in this transaction: https://ftmscan.com/tx/0x715f4b884e73449ac26f467ab8642adea13bee9db7b438c11970249730f57058.  The role of this contract was to enable HEC tokenholders to deposit tokens in exchange for interest and rewards that the Named Defendants promised.  Since only the Named Defendants would have paid for the smart contract that performed the transactions that the Named Defendants solicited, it is clear that they are the ones who control the Hector Deployer Wallet.

37. Further, Doe was able to use the Redemption Contract to obtain Treasury Assets, despite Hector DAO's rules limiting access to wallets which had been registered with eligible HEC tokens.  The Exploit Wallet, as recorded in the immutable Fantom blockchain, did not have eligible HEC tokens. This means that Hector DAO expressly made an exception to its rules that permitted Doe to access the Redemption Contract, enabling the Redemption Cyberattack.

38. As a result of the Redemption Cyberattack, Hector DAO has fewer assets to distribute to HEC tokenholders in a redemption.  This reduced the value of HEC tokens by over 22%.

## COUNT I: BREACH OF CONTRACT AGAINST THE NAMED DEFENDANTS

39. The Fund hereby restates and incorporates by reference Paragraphs 1 through 38 as though fully set forth herein.

40. Hector DAO solicited investments on the promise that it would abide by the results of elections it held. The Fund entered to an agreement with Hector DAO by purchasing HEC tokens, obtaining a right to vote in elections in exchange for Hector DAO's promise to abide by the election results.

41. Tokenholders like the Fund fully performed their obligations pursuant to that agreement. They purchased tokens and voted in elections that Hector DAO administered.

42. Tokenholders voted for Hector DAO to conduct a redemption, whereby eligible HEC tokens would be exchanged for a pro rata share of Treasury assets. Hector DAO has expressly admitted that this was the outcome of the election.

43. Still, over six months later, Hector DAO has failed to perform its obligation to redeem HEC tokens for Treasury assets.

44. This breach has caused tokenholders like the Fund to suffer damages in an amount to be determined at trial. The breach has caused its investment in HEC tokens to diminish in fundamental value because it no longer can be exchanged for the assets the Hector DAO has lost during the period of the redemption delay.

45. Since Hector DAO is an unincorporated association, Hassan is liable for the obligations Hector DAO assumed as one of its principals.

WHEREFORE, the Fund demands judgment against the Named Defendants as follows:

(a) Awarding the Fund damages, including pre- and post-judgment interest;

(b) Granting the Fund such other and further relief as the Court may deem just and equitable.

## COUNT II: UNREGISTERED OFFER AND SALE OF SECURITIES PURSUANT TO SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT OF 1933 AGAINST THE NAMED DEFENDANTS

46. The Fund hereby restates and incorporates by reference Paragraphs 1 through 45 as though fully set forth herein.

47. Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

11

48. Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id*. at § 77e(c).

49. The Named Defendants promoted, solicited, or sold HEC tokens to the Fund through their website, Discord, Twitter, Medium.com, and other forms of electronic communication. Thus, the Named Defendants used instruments of communication in interstate commerce to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

50. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

51. Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to

recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. at § 77L.

52. HEC tokens are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

53. The relevant test for whether a digital asset is a security under the Securities Act is based on *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

54. As it relates to cryptocurrencies, the *Howey* test has been further refined by more recent guidance, such as the SEC's 2019 "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework").

55. The *Howey* test looks to whether there is: 1) an investment of money; 2) in a common enterprise; 3) with an expectation of profit; 4) from the efforts of others.

56. <u>There was an Exchange of Money</u>. The first element of the *Howey* test is satisfied here because the Fund purchased its HEC tokens in exchange for value in the form of another digital asset. *See also,* Framework (explaining that the "investment of money" will typically occur "in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of . . . fiat currency, another digital asset, or other type of consideration.").

57. <u>In a Common Enterprise</u>. The second *Howey* requirement of a "common enterprise" is also satisfied, as evidenced by the existence of both "horizontal" and "vertical" commonality.

58. Horizontal commonality exists because there was a common enterprise between the Fund and the other investors in the HEC token.

59. As alleged herein, the funds of all investors were pooled together and held in one or more treasury accounts managed by the Named Defendants and other related people.

60. The sharing of profits and risks also existed. Specifically, investments were solicited by the Named Defendants based upon the promise of that Hector DAO would maintain a treasury that conferred value on HEC tokens because of its potential for a pro rata distribution of net profits based upon investors' holdings of HEC tokens.

61. The Fund and the other investors in HEC also clearly shared the risk of loss in accordance with their pro rata holdings. Indeed, this case revolves around the diminution of the Fund's investment through the actions of the Defendants and, following the July 2023 vote of HEC tokenholders to liquidate the Treasury Assets, each investor stood to receive pennies on the dollar in proportion to their token holdings.

62. Vertical commonality also exists because there was a common

enterprise between the Fund (as well as the other investors) and the Named Defendants. At all times, the value proposition of the Fund's investment was tied to the efforts and fortunes of the Named Defendants and its associated persons.

63. The Fund and others invested based on the representation that their funds would be used by the Named Defendants and its associated persons to develop the various projects associated with the Hector Network (e.g., a decentralized exchange, NFTs, and a multichain bridge), attract investment through marketing and other avenues, and generally grow the user base of its products through community engagement and partnerships.

64. The Named Defendants also represented, and the Fund understood, that the Named Defendants stood to personally profit from the success of the project in the same fashion as investors, through holding a significant portion of the circulating supply of HEC and through setting a goal of token "deflation" whereby the value of the HEC token would conceivably increase over time.

65. <u>With the Expectation of Profit</u>. Based on the foregoing, it is clear that the Fund and the other investors had a reasonable expectation of profit derived from the efforts of others.

66. Beyond those considerations, however, the Framework identifies several secondary considerations that gave rise to an expectation of profit here.

67. First, the HEC token was transferable or traded on or through numerous

15

secondary markets and platforms, including various "DeFi" or "decentralized" exchanges.

68. Second, the HEC token was offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

69. Third, the Named Defendants benefited from holding the same class of assets (e.g., the HEC token) as those being distributed to the public.

70. Fourth, the HEC token and the investments solicited from the Fund and others was used to fund the development or ongoing operations of the Named Defendants' network and business.

71. Fifth and finally, the Named Defendants marketed the HEC token in terms that indicated it was an investment.

72. <u>Derived from the Efforts of Others</u>.  As alleged herein, the Named Defendants and its associated people were responsible for the development, improvement, operation, or promotion of the network; essential tasks or responsibilities; creating a supporting a market for, or the price of, the HEC token; developing the related network; managerial tasks; and other tasks that investors would reasonably expect to enhance the value of the network or digital asset.

73. For all of these reasons, this element of *Howey* is also satisfied.

74. The Named Defendants violated Sections 5(a), 5(c), and 12(a)(1) of the

Securities Act by promoting and selling HEC tokens without registration.

WHEREFORE, the Fund demands judgment against the Named Defendants as follows:

(a) Awarding the Fund rescissory damages, including pre- and post-judgment interest;

(b) Granting the Fund such other and further relief as the Court may deem just and equitable.

## COUNT III: BREACH OF FIDUCIARY DUTY AGAINST THE NAMED DEFENDANTS

75. The Fund hereby restates and incorporates by reference Paragraphs 1 through 74 as though fully set forth herein.

76. Hector DAO and Hassan owed a fiduciary duty to tokenholders. This duty arose in two places. First, it arose from the Named Defendants' roles as the promoters and sellers of HEC tokens. And second, the duty arose from their roles as administrators of the Treasury, which held assets on behalf of tokenholders.

77. The Named Defendants breached this fiduciary duty in three ways. First, they breached the duty by dissipating Treasury assets through unduly large payments to its own members. Second, they breached the duty by dissipating Treasury assts through unreasonably large payments to third parties without commensurate benefit. And third, they breached the duty through failure to protect the Treasury from the Redemption Cyberattack.

78. As a direct and proximate result of these breaches, tokenholders like the Fund have suffered damages in an amount to be determined at trial. These breaches have caused the Fund's investments in HEC tokens to diminish in value. This is because these breaches have depleted the Treasury assets for which investors could redeem HEC tokens.

WHEREFORE, the Fund demands judgment against the Named Defendants as follows:

(a) Awarding the Fund damages, including pre- and post-judgment interest;

(b) Granting the Fund such other and further relief as the Court may deem just and equitable.

### COUNT IV: CONVERSION AGAINST ALL DEFENDANTS

79. The Fund hereby restates and incorporates by reference Paragraphs 1 through 78 as though fully set forth herein.

80. The Fund has an interest in the Stolen Assets. It holds HEC tokens, which the Hector DAO promised to redeem for Treasury assets, which include the Stolen Assets.

81. The John Doe Defendant took the Stolen Assets with the assistance of the Named Defendants.

82. The John Doe Defendant transferred the Stolen Assets to accounts held by the Named Defendants.

83. Upon information and belief, the Defendants now possess the Stolen Assets.

WHEREFORE, the Fund demands judgment against the Defendants as follows:

(a) Awarding the Fund damages, including pre- and post-judgment interest;

(b) Granting the Fund such other and further relief as the Court may deem just and equitable.

Dated: February 7, 2024　　　　　　　　　　Respectfully submitted,

/s/ *Eric B. Meyer*
Eric B. Meyer
Pierson Ferdinand LLP
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (267) 225-4813
Email: eric.meyer@pierferd.com

*Counsel for Plaintiff
Newtown AC/DC Fund L.P.*